6 F.3d 705
 62 USLW 2257
 Myrna CHEFFER, Plaintiff-Appellant,
v.
Robert McGREGOR, Circuit Judge for the 18th Judicial
Circuit, Norman Wolfinger, State Attorney for Seminole and
Brevard Counties, Claude Miller, Sheriff for Brevard County,
Keith I. Chandler, Melbourne, Chief of Police, Defendants-Appellees.
 No. 93-2407.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 20, 1993.
 
 Mathew D. Staver and Jeffrey T. Kipi, Orlando, FL, for plaintiff-appellant.
 Gerald B. Curington, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL and James L. Reinman, Melbourne, FL, for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and PAINE*, Senior District Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 Myrna Cheffer appeals from the district court's denial of her motion for a preliminary injunction preventing the enforcement of a state court injunction that regulates antiabortion speech at an abortion clinic. Because the district court mistook the legal significance of the state court injunction, and therefore erred in its application of the law to the merits of Cheffer's motion, we vacate and remand.
 
 I.
 
 2
 Perhaps few Americans are content with the current legal status of abortion in America. Many see a woman's ability to choose abortion as a part of her fundamental constitutional right of self-determination that is ill-protected by the wavering jurisprudence of the Supreme Court. Many others see the 1.4 million abortions each year as an American Holocaust permitted by the moral vacillation of the government. This case arises out of the clash of these opposing beliefs, and governmental attempts to restrict their free expression.
 
 
 3
 The Aware Woman Center for Choice is a corporation that operates an abortion clinic in a residential neighborhood in Melbourne, Florida. Operation Rescue is a major antiabortion organization known for picketing abortion clinics such as the Aware Woman Center. The Honorable Robert McGregor is a Florida Circuit Judge. Judge McGregor's docket includes the case Aware Woman Center for Choice v. Operation Rescue, No. 91-2811-CA-16-K, which concerns the conflict that arose when Operation Rescue and others began an aggressive campaign of picketing against the abortion clinic.
 
 
 4
 On April 8, 1993, Judge McGregor issued an Amended Permanent Injunction[1] in which he enjoined certain activities of Operation Rescue and others in a court-drawn "buffer zone" surrounding the abortion clinic. The injunction, which was (to say the least) legislative in tone, was directed at
 
 
 5
 Operation Rescue, Operation Rescue America, Operation Goliath, their officers, agents, members, employees and servants, and Ed Martin, Bruce Cadle, Pat Mahoney, Randall Terry, Judy Madsen, and Shirley Hobbs, and all persons acting in concert or participation with them, or on their behalf, with notice in any manner or by any means of this order.
 
 
 6
 This group (collectively "Operation Rescue" or "the state court defendants") was enjoined
 
 
 7
 (1) At all times on all days, from entering the premises and property of the Aware Woman Center for Choice, Inc. Clinic (hereinafter Clinic) located at the northwest corner of U.S. Highway One and Dixie Way in Melbourne, Brevard County, Florida.
 
 
 8
 (2) At all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot of the Clinic.
 
 
 9
 (3) At all times on all days, from congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within thirty-six (36) feet of the property line of the Clinic.... It is the intent of the court that the [defendants] may use, subject to other restrictions contained herein, the unpaved portion (the shoulder) on the south side of Dixie Way....
 
 
 10
 (4) During the hours of 7:30 a.m. through noon, on Mondays through Saturdays, during surgical procedures and recovery periods, from singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the Clinic.
 
 
 11
 (5) At all times on all days, in an area within three-hundred (300) feet of the Clinic, from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring of the [defendants]. In the event of such invitation, the [defendants] may engage in communications consisting of conversation of a nonthreatening nature and by the delivery of literature within the three-hundred (300) foot area but in no event within the 36 foot buffer zone. Should any individual decline such communication, otherwise known as "sidewalk counseling", that person shall have the absolute right to leave or walk away and the [defendants] shall not accompany such person, encircle, surround, harass, threaten or physically or verbally abuse those individuals who choose not to communicate with them.
 
 
 12
 (6) At all times on all days, from approaching, congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within three-hundred (300) feet of the residence of any of the petitioners' employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner, temporarily or otherwise, obstruct the entrances, exits or driveways of the residences of any of the petitioners' employees, staff, owners or agents.
 
 
 13
 A map attached to the injunction indicated a "buffer zone" to be established around the boundaries of the clinic property. The buffer zone included a public sidewalk in front of the clinic as well as a public street and adjacent right-of-way.
 
 
 14
 On its face, the injunction appears to "criminalize" various acts of peaceful protest, including the mere penetration of the buffer zone by anyone acting "in concert" with those named in the injunction. It purports to provide the following enforcement mechanism:
 
 
 15
 Law enforcement authorities, pursuant to the protective provisions of the court's order, are authorized to arrest those persons who appear to be in willful and intentional disobedience of this injunction. Upon such arrest the person so arrested shall be admitted to bail upon the posting of a $500 cash or surety bond.... In the event of arrest and no bond being posted, the person arrested shall be promptly transferred to the Seminole County jail.... Such arrested persons shall be brought before the undersigned judge not later than 8:30 am of the day following his confinement in the Seminole County jail.[2]
 
 
 16
 The local police understood the injunction to require them to arrest "pro-life" individuals who violated the buffer zone. On April 11, 1993, approximately 50 apparently "pro-life" individuals were arrested for entering the buffer zone. Myrna Cheffer was not among them. Nevertheless, she filed this suit in federal district court seeking to enjoin enforcement of the state court injunction.[3]
 
 
 17
 Cheffer claimed that the injunction acted as a prior restraint on her free speech rights, and that the threat of arrest chilled her ability to exercise these rights. She sought a temporary restraining order as well as both preliminary and permanent injunctions to block the state court injunction. The district court denied the motions for a temporary restraining order and a preliminary injunction, finding that the balance of equities did not weigh in Cheffer's favor. The court deferred ruling on the motion for a permanent injunction. Cheffer now appeals.
 
 
 18
 We review a denial of an application for a preliminary injunction for abuse of discretion, adopting the district court's findings of fact unless clearly erroneous, but reviewing jurisdictional issues de novo. Lucero v. Operation Rescue of Birmingham, 954 F.2d 624, 627 (11th Cir.1992). We consider the questions of standing and abstention in part II, then turn, in part III, to the merits of the case.
 
 II.
 
 19
 An injunction is an extraordinary remedy that operates only on the parties before the court. Legislation operates more broadly, extending to all actors within the legislature's territorial jurisdiction. Nevertheless, when Judge McGregor issued the Amended Permanent Injunction in the state case, he, in effect, created a criminal statute prohibiting "pro-life" free speech activity in a certain geographical location. Had he merely enjoined the defendants in the state suit from certain actions, Cheffer would have suffered no injury--she would be free to engage in peaceful speech activity on the sidewalk in front of the clinic. But by extending the injunction to nonparties and by attaching criminal penalties to activities otherwise protected by the Constitution, Judge McGregor crafted a law that seems to apply to Cheffer, who is neither a party nor an agent of any party.[4] It is this unusual characteristic of the injunction that seems to have misled the district court. We refuse to prefer form over substance; the injunction has all the attributes of a criminal statute and we will treat it accordingly.
 
 A.
 
 20
 Although she was neither a party to the state suit nor one of those arrested for violating the buffer zone, Cheffer does not lack standing to bring this case. A plaintiff in federal court must satisfy the "case or controversy" requirement of Article III of the Constitution by showing that she has suffered an injury-in-fact that would be corrected by favorable decision in the lawsuit. Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471-72, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).
 
 
 21
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."
 
 
 22
 Id. (citations omitted) (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). Thus, a plaintiff who has not been prosecuted under a criminal statute does not normally have standing to challenge the statute's constitutionality. See Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971) (finding that plaintiffs who had neither been prosecuted nor specifically threatened with prosecution did not have standing).
 
 
 23
 Standing requirements to challenge speech restrictions, however, are less strict. "[I]n the First Amendment context, [l]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Virginia v. American Booksellers Assoc., Inc., 484 U.S. 383, 392-93, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988) (internal quotations omitted); see also Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 956-57, 104 S.Ct. 2839, 2846-47, 81 L.Ed.2d 786 (1984); Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).[5] We conclude that Cheffer has standing to challenge the restrictions placed on her free speech by the Amended Permanent Injunction.
 
 B.
 
 24
 Neither does the abstention doctrine block Cheffer's suit. The Supreme Court has directed that federal courts should not intervene in ongoing state proceedings "when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." See Younger v. Harris, 401 U.S. 37, 43-44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971).[6]
 
 
 25
 As we have noted before,
 
 
 26
 the initial inquiry in determining whether a federal court should abstain when asked to enjoin an ongoing state civil proceeding is whether an important governmental interest of the state is implicated by that civil action so that such an injunction would be an offense to the State's interest ... likely to be every bit as great as it would be were this a criminal proceeding.
 
 
 27
 First Alabama Bank v. Parsons Steel, Inc., 825 F.2d 1475, 1483 (11th Cir.1987) (internal quotations omitted), cert. denied, 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988). It appears that important state interests, including the enforceability of state court injunctions, are involved in the present case.
 
 
 28
 Younger abstention is only appropriate, however, when the federal constitutional claims at issue can be raised by the federal plaintiff in an ongoing state court proceeding. Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (holding that Younger applies "so long as in the course of [the state] proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim"); see also Juidice, 430 U.S. at 337, 97 S.Ct. at 1218. In the instant case, Cheffer has no remedy in state court except to subject herself to a criminal contempt citation (which she probably could not resist on the ground that the underlying injunction is unconstitutional, see In re Novak, 932 F.2d 1397, 1401-02 (11th Cir.1991)). The Younger abstention doctrine therefore is inapplicable[7] and the district court has jurisdiction to hear Cheffer's claim.[8]
 
 III.
 
 29
 It is against this backdrop, then, that the district court must consider the four prerequisites to preliminary injunctive relief. Cheffer had "the burden of proving: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) [her] own injury outweighs the injury to [the clinic]; and (4) the injunction would not disserve the public interest." Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1022 (11th Cir.1990); Lucero, 954 F.2d at 627. The district court denied the motion for a preliminary injunction because it determined that Cheffer had not demonstrated that the balance of equities weighed in her favor. We conclude that the district court's misunderstanding of the legal significance of the injunction improperly colored its analysis. We must, therefore, vacate the order and remand the matter to the district court for further consideration of the plaintiff's motion for a preliminary injunction.
 
 A.
 
 30
 The district court must first consider whether Cheffer demonstrated a substantial likelihood of success on the merits. When reduced to its essentials, Judge McGregor's Amended Permanent Injunction, by operating on persons not before the court, serves as a statute of local effect regulating picketing by anti-abortion speakers. As a viewpoint-based restriction operating in a traditional public forum (the public streets and sidewalks around the clinic), it is subject to a most stringent review:
 
 
 31
 In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980).
 
 
 32
 Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983). That the clinic is in a residential neighborhood does not remove the characterization of the adjoining streets and sidewalks as traditional public fora. Frisby v. Schultz, 487 U.S. 474, 479, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) ("[O]ur decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a 'cliche,' but recognition that '[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public.' " (citations omitted)).[9]
 
 
 33
 That the speech restrictions at issue here are viewpoint-based cannot seriously be doubted.[10] The order enjoinsOperation Rescue, Operation Rescue America, Operation Goliath, their officers, agents, members, employees and servants, and Ed Martin, Bruce Cadle, Pat Mahoney, Randall Terry, Judy Madsen, and Shirley Hobbs, and all persons acting in concert or participation with them or on their behalf....
 
 
 34
 Such a restriction is no more viewpoint-neutral than one restricting the speech of "the Republican Party, the state Republican Party, George Bush, Bob Dole, Jack Kemp and all persons acting in concert or participation with them or on their behalf." The practical effect of this section of the injunction was to assure that while "pro-life" speakers would be arrested, "pro-choice" demonstrators would not.[11]
 
 
 35
 A viewpoint-specific restriction in a traditional public forum is unconstitutional unless (1) it is necessary to serve a compelling state interest and (2) it is narrowly drawn to achieve that end. See Carey, 447 U.S. at 461-62, 100 S.Ct. at 2290. The state court injunction does not seem to be either.
 
 B.
 
 36
 The second inquiry concerns the threat of irreparable injury faced by the plaintiff. The Supreme Court has noted that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); see New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).
 
 C.
 
 37
 The third inquiry is into the relative injury to Cheffer and to the clinic. The district court concluded that Cheffer did not carry her burden as to this point.
 
 
 38
 It is difficult indeed to weigh the relative value of different constitutional rights. Our sister circuit described a similar abortion protest case as a "clash ... between constitutional rights defined by the Supreme Court: an old one tracing its roots to the speech clause of the First Amendment and before, and a new one stemming from Roe v. Wade." Mississippi Women's Medical Clinic v. McMillan, 866 F.2d 788, 791 (5th Cir.1989). We note, however, that in the instant case there is no indication in the record that women were actually prevented from obtaining abortions at the Aware Woman Center for Choice. The clash here is between an actual prohibition of speech and a potential hinderance to the free exercise of abortion rights.[12] Should the district court issue an injunction barring the state court from enforcing its injunction as a criminal statute, it would promote only speech and expressive conduct, not assault, trespass, or destruction of property.D.
 
 
 39
 Finally, the district court must consider whether the issuance of the federal injunction would disserve the public interest. The importance of "the principle that debate on public issues should be uninhibited, robust, and wide-open" suggests that the issuance of the injunction would be no disservice at all.
 
 
 40
 It is tempting, of course, to entertain the argument that the speech in this case is disruptive, discourteous, and offensive, but that is irrelevant. The Supreme Court recently reminded us
 
 
 41
 [a]s we have often had occasion to repeat, " '[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.' " Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (quoting FCC v. Pacifica Foundation, 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978)). " 'If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' " United States v. Eichman, 496 U.S. 310, 319, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287 (1990) (quoting Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989)).
 
 
 42
 Simon & Schuster v. New York Crime Victims Bd., --- U.S. ----, ----, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991). We protect much that offends in the name of free speech--we cannot refuse such protection to those who find abortion morally reprehensible.
 
 IV.
 
 43
 The district court treated the state court injunction as an ordinary injunction when it had the effect of a criminal statute. Consequently, the order of the district court was founded on a mistake of law. We vacate the order, and remand for further consideration of the issuance of a preliminary injunction in light of this opinion.
 
 
 44
 IT IS SO ORDERED.
 
 PAINE, District Judge, dissenting:
 
 45
 I would remand this case with instructions to the district court to enjoin enforcement of the state court's Amended Permanent Injunction against Myrna Cheffer ("Cheffer"), a person shown not to be acting in concert with the respondents in the state case.
 
 
 46
 The central facts of this matter concern the harassment of the function or undertakings of the Aware Woman Center for Choice, an abortion clinic. Prior restraint of the constitutional right of free speech by Cheffer is a concomitant issue adequately treated by the district court order. The strong remand suggested by the majority, bottomed on free speech, provides an imprecise emphasis.
 
 
 47
 The Amended Permanent Injunction details a factual background omitted by the majority opinion. On September 30, 1992, Judge Wallace H. Hall had entered an injunction against Respondents, three pro-life organizations and six individual pro-life activists, prohibiting interference with ingress to the Aware Woman Center. On April 8, 1993, following a three-day evidentiary hearing on Petitioners' motion to modify the injunction, Judge Robert McGregor found, in summary, that:
 
 
 48
 A. Despite the previous injunction, persons continued to interfere with ingress to the clinic, by standing on the paved portions of Dixie Highway, standing, kneeling, and sitting on the unpaved portions of the road, approaching moving vehicles on the paved surface, and marching in a picket line that traversed the entrance driveways to the facility's two parking lots. Cars approaching the area were forced to slow down, particularly those wishing to enter the parking lots.
 
 
 49
 B. Crowds of up to 400 people would gather at the clinic one to three times per week. The crowds included, not only the named Respondents, but other pro-life demonstrators, pro-choice demonstrators, up to 50 law enforcement officers engaging in crowd and traffic control, and media representatives.
 
 
 50
 C. The gatherings would feature singing, chanting, whistling, music, and bullhorns. Pro-life and pro-choice groups would shout and yell at each other, often competing to make the most noise.
 
 
 51
 D. The police were sometimes forced to erect barricades to separate the rival groups and permit traffic flow. The pro-life demonstrators would generally remain in the public right of way, while their pro-choice counterparts occupied private property on the clinic's lawn and parking lot.
 
 
 52
 E. Vehicles slowing to enter the clinic's driveway would be approached by persons designated by Respondents as "sidewalk counselors," who attempted to hand anti-abortion literature to the occupants and discourage their use of the clinic.
 
 
 53
 F. The clinic has fences on its west and north sides. Persons would occasionally climb a ladder above the fences to shout at staff and patients entering the facility. On one occasion a demonstrator yelled to a clinic staffer, "I pray that God strikes you dead now!"
 
 
 54
 G. Since the entry of the previous injunction, Respondent Bruce Cadle and others in concert with him have approached the private residences or temporary lodging places of clinic employees, to confront the occupants (including minor children), picket, shout at passers-by, contact neighbors, and hand out literature identifying the employee as a "baby killer."
 
 
 55
 H. On one occasion, Cadle and others demonstrated outside a motel where a staff physician was staying. While Cadle remained outside, his cohorts entered the motel lobby, yelling "child murderer" and "baby killer." The disturbance delayed the doctor's departure for the clinic by one-half hour.
 
 
 56
 I. The same physician was once delayed outside the clinic while Cadle and others stood in front of his car, screaming "baby killer--we don't want you here in Melbourne." This physician further witnessed demonstrators running alongside, and in front of, patients' vehicles, pushing pamphlets in car windows to persons who had not indicated any interest therein. Patients experiencing this confrontation manifested a higher level of anxiety and hypertension, requiring a heavier sedation, and its associated medical risks, to undergo the surgical procedure. The noise of singing, chanting, and shouting also caused stress to patients during the surgery and recuperation. In addition, the doctor observed prospective patients turn away from the crowd in the clinic's driveway to return at a later date, which only increases the risk associated with the procedure.
 
 
 57
 J. While driving home one evening, the same physician was followed by a person associated with Respondents, who pretended to shoot him from an adjoining vehicle. As a result of these activities, and the shooting of a physician in North Florida by an anti-abortionist, the physician terminated his employment with the clinic.
 
 
 58
 K. Respondents or persons in concert with them recorded the license plate numbers of clinic patients, obtained their home addresses, and contacted the patients. On occasion, multiple telephone calls have been placed to the clinic, jamming their telephone lines and making it impossible to summon an ambulance for a medical emergency. Patients and staff are sometimes followed in a stalking manner when they leave the clinic, causing them great apprehension.
 
 
 59
 Judge McGregor thereupon entered the Amended Permanent Injunction against Respondents, Operation Rescue, Operation Rescue America, Operation Goliath, Ed Martin, Bruce Cadle, Pat Mahoney, Randall Terry, Judy Madsen, Shirley Hobbs, and all persons acting on behalf of or "in concert with" them,[1] the prohibitions of which are summarized by the majority.
 
 
 60
 This federal proceeding involves the constitutional challenge of Cheffer, a pro-life activist who claims that she is not working in concert with the named Respondents, wishes to engage in peaceful "sidewalk counseling" near the clinic, but fears arrest because (i) 50 similarly independent pro-life demonstrators were arrested on April 10, 1993, and (ii) Judge McGregor commented, during their initial appearances, that he considered any pro-life demonstrator to be acting in concert with the named Respondents for purposes of the Amended Permanent Injunction. On April 13, 1993, Cheffer filed a Verified Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, Motion for Temporary Restraining Order, Motion for Preliminary Injunction and Permanent Injunction, with supporting affidavits and memoranda of law, seeking to prevent enforcement of the Amended Permanent Injunction against her. The next day, the district court denied the requests for a temporary restraining order and preliminary injunction "[b]ased on a review of the case file and the relevant law," without conducting an evidentiary hearing or permitting further briefing.
 
 
 61
 The majority concludes that "the district court mistook the legal significance of the state court injunction...." Based upon a provision authorizing the arrest of willful violators, and the subsequent arrest of persons who claim no association to the state court litigation, the majority, in the name of "substance over form," but without citation of legal precedent, elects to treat the Amended Permanent Injunction as a criminal statute and remands the case so that the district court may do the same.[2] This Court has, however, previously affirmed an arrest, detention, and conviction pursuant to a civil injunction that expressly provided: "Anyone having notice of this order who violates any of the terms thereof shall be subject to arrest, prosecution and punishment by imprisonment or fine, or both, for criminal contempt...." United States v. Hall, 472 F.2d 261, 263-64 (5th Cir.1972) (emphasis added).[3] Furthermore, this Court has analyzed an injunction purportedly directed at "all persons who are residents of Colquitt County, Georgia" as "impermissibly broad," narrowed its application to the parties, then affirmed the injunction as modified. Harrington v. Colquitt County Bd. of Educ., 449 F.2d 161 (5th Cir.1971). The majority's unprecedented decision to assume an impossibility--that a state court judge has passed legislation--skews its analysis.
 
 
 62
 This improper analytical framework affects the threshold question whether Cheffer, as a supposed stranger to the litigation, has standing to attack the Amended Permanent Injunction. Because the majority has deemed the order an act of legislation, it invokes the substantial overbreadth doctrine, which permits First Amendment litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Virginia v. American Booksellers Assoc., Inc., 484 U.S. 383, 392-93, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988); see also Massachusetts v. Oakes, 491 U.S. 576, 582, 109 S.Ct. 2633, 2637-38, 105 L.Ed.2d 493 (1989). Under this analysis, Cheffer's own intention to speak is considered by the majority to be "unimportant."
 
 
 63
 The substantial overbreadth doctrine, however, has no application to injunctions, which bind only the parties and do not chill the conduct of others. United States v. Local 560 (I.B.T.), 974 F.2d 315, 344 n. 16 (3rd Cir.1992). A non-party ordinarily lacks standing to assert the free speech constitutional rights of parties subject to an injunction. Radio & Television News Ass'n v. United States Dist. Court, 781 F.2d 1443, 1448 (9th Cir.1986); see generally Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 80-81, 98 S.Ct. 2620, 2634-35, 57 L.Ed.2d 595 (1978) (discussing third-party standing). Cheffer's standing hinges entirely on her intention to speak and the "credible threat" of prosecution posed by Judge McGregor's statements regarding his interpretation of the injunction. Kolender v. Lawson, 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 1858 n. 3, 75 L.Ed.2d 903 (1983); see also Steffel v. Thompson, 415 U.S. 452, 459-60, 94 S.Ct. 1209, 1215-16, 39 L.Ed.2d 505 (1974). Cheffer has proven a sufficient connection to the state court injunction to confer standing.
 
 
 64
 A review of Younger v. Harris, 401 U.S. 37, 41-43, 46, 91 S.Ct. 746, 749-50, 751, 27 L.Ed.2d 669 (1971), and its progeny leads to the conclusion that abstention is inappropriate here, because Cheffer is not a party to the state case, nor are her interests "intertwined" with those of the parties. See Hicks v. Miranda, 422 U.S. 332, 348-49, 95 S.Ct. 2281, 2291-92, 45 L.Ed.2d 223 (1975); Doran v. Salem Inn, Inc., 422 U.S. 922, 928-29, 95 S.Ct. 2561, 2566-67, 45 L.Ed.2d 648 (1975).
 
 
 65
 The majority opinion directs that the district court's order be vacated, remanding the case for application of the four-part test for preliminary injunctive relief.[4] But further proceedings below are unwarranted. Only different instructions to the district court are needed. When the Amended Permanent Injunction is properly viewed as an injunction, it becomes clear that the state court lacks the power to reach Cheffer. "[C]ourts ... may not grant an injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." Regal Knitwear Co. v. NLRB, 324 U.S. 9, 13, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945).[5] Given the "credible threat" of prosecution posed by Judge McGregor's comments, see Kolender, 461 U.S. at 355 n. 3, 103 S.Ct. at 1858 n. 3, Cheffer is entitled to an order prohibiting enforcement of the Amended Permanent Injunction against her.[6]
 
 
 
 *
 Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Circuit Judge Wallace H. Hall had entered a prior injunction on September 30, 1992. In the Amended Permanent Injunction, Judge McGregor found that the prior injunction had not prevented "interference with ingress to ... the Aware Woman Clinic."
 
 
 [2]
 It is obvious to us that Judge McGregor did not intend the Amended Permanent Injunction to be enforced through the civil contempt process. See Blalock v. United States, 844 F.2d 1546, 1558-60 (11th Cir.1988) (contrasting civil and criminal contempt). The injunction clearly attempts to circumvent a civil contempt process that the judge considered too cumbersome
 
 
 [3]
 An appeal of the injunction is currently before the Florida Supreme Court
 
 
 [4]
 Although we may be permitted our doubts as to the legitimacy of the injunction under Florida law (because, for one thing, it serves as a criminal sanction under the cloak of a civil injunction and thus may constitute an abuse of process), we assume, for the sake of argument, that Judge McGregor did not overstep his authority in crafting the order
 
 
 [5]
 Under this rule of standing, it is unimportant that Cheffer has alleged that she intends to exercise her own rights to free speech
 
 
 [6]
 Younger itself expressed a fundamental "public policy against federal interference with state criminal prosecutions," 401 U.S. at 43, 91 S.Ct. at 750, but later cases have extended this deference to some state civil actions. In general, "[t]he policies underlying Younger are fully applicable to noncriminal judicial proceedings when important state interests are involved." Middlesex County Ethics Comm. v. Garden State Bar Assoc., 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); see Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). In particular, the Supreme Court extended the doctrine to cover the civil contempt process in Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). The issue to be resolved is whether "the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." Pennzoil, 481 U.S. at 11, 107 S.Ct. at 1526
 
 
 [7]
 The defendants do not claim that the abstention doctrines require Cheffer to submit to arrest in order to be able to challenge the restriction in state court
 
 
 [8]
 Cheffer argues that the issuance of a preliminary injunction in the free speech context turns solely on whether the challenged action is unconstitutional. In other words, she suggests that "[o]nce a violation of the First Amendment is established, preliminary injunctive relief is mandated." She relies, for this proposition, on Gold Coast Publications, Inc. v. Corrigan, 798 F.Supp. 1558 (S.D.Fla.1992). While we agree that it is unlikely that an unconstitutional restriction would fail to warrant an injunction, we prefer that the district court follow the traditional analysis
 
 
 [9]
 In any case, the forum issue is not dispositive since the restriction is not viewpoint neutral. Even a nonpublic forum can only be regulated in a neutral fashion:
 Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.
 Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985) (citations omitted). A restriction on "pro-life" speech would not even be permissible in the context of a nonpublic forum.
 
 
 [10]
 We note that the Ninth Circuit reached a different result on similar facts in Portland Feminist Women's Health Center v. Advocates for Life, Inc., 859 F.2d 681 (9th Cir.1988). There, an injunction against "demonstrating or distributing literature ...; shouting, screaming, chanting, or yelling" by anti-abortion organizations and those acting in concert was deemed to be content-neutral and thus a reasonable time, place, or manner restriction on speech. Id. at 684, 686. The court argued
 the preliminary injunction is not a content-based restriction of expression. It refers not at all to the specific viewpoints that the advocates press, nor even to the general issues raised at their demonstrations. Rather, it focuses exclusively on the location and manner of expression. It protects the clinic from loudness and physical intimidation, not from content of speech. Therefore, we apply to the preliminary injunction the rules regarding the constitutionality of "time, place, and manner" regulations of speech.
 Id. at 686. We do not find this reasoning at all persuasive.
 
 
 [11]
 This is apparently precisely what occurred. Several of those arrested testified (at a preliminary hearing convened by Judge McGregor as provided for in the injunction) that they were designated for arrest by clinic workers and police officers because they were perceived to be "pro-life." Judge McGregor accepted this interpretation of the intent of the injunction and explained (to the arrestees):
 [T]he injunction did not pertain to those on the other side of the issue, because the word in concert with means in concert with those who had taken a certain position in respect to the clinic, adverse to the clinic. If you are saying that is selective basis that the pro-choice were not arrested when pro-life was arrested, that's the basis of that selection.
 
 
 [12]
 In the Amended Permanent Injunction the state circuit court recites a variety of inconveniences (e.g., "As vehicular traffic approached the [clinic] area it would, in response to the congestion, slow down. If the destination of such traffic was either of the two parking lots of the [clinic], such traffic slowed even more, sometimes having to momentarily hesitate or stop until persons in the driveway moved out of the way.") (emphasis added). Those apparently isolated incidents which were more intrusive (e.g., "stalking") are, for the most part, already tortious or criminal
 
 
 [1]
 Florida Rule of Civil Procedure 1.610(c), like Federal Rule of Civil Procedure 65(d), provides that "[e]very injunction ... shall be binding on the parties to the action, their officers, agents, servants, employees, and attorneys and on those persons in active concert or participation with them who receive actual notice of the injunction." These procedural rules are derived from the common law doctrine that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945)
 
 
 [2]
 In so doing, the majority manages to read Judge McGregor's mind, determining that he "considered [the civil contempt process] too cumbersome."
 
 
 [3]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [4]
 The implication that the district court did not examine the request for preliminary injunction in light of (a) the likelihood of success on the merits, (b) irreparable injury, (c) relative injury to Cheffer and the clinic, and (d) whether issuance of the federal injunction would disserve the public interest is not supported by the record. The district court's order makes note of these requirements and concludes that the burden of proof was not met as to items (c) and (d)
 
 
 [5]
 In United States v. Hall, 472 F.2d 261, 264-65 (5th Cir.1972), this Court held that an injunction against obstructing school children's access to class could be applied to a non-party acting independently of the parties, because his conduct interfered with the plaintiff children's right to attend school and the defendant school board's duty to provide schooling. But this holding was clearly affected by the non-party's prior notice of the injunction and statement to police that he specifically intended to violate it. See 472 F.2d at 267 ("Rather than challenge [the injunction] by the orderly processes of law, he resorted to conscious, willful defiance."). Under the instant circumstances, Cheffer should be bound by the Amended Permanent Injunction only if she acted in concert with the named state litigants
 
 
 [6]
 Nothing in this dissent, or the majority opinion for that matter, would prevent entry of a separate injunction against Cheffer if she harasses, intimidates, or otherwise abridges the rights of clinic patients or staff employees