Katherine SABELKO and Nancy Barto, Plaintiffs,

v.

The CITY OF PHOENIX, et al., Defendants.

No. CIV 93–2229–PHX–SMM.

United States District Court, D. Arizona.

Feb. 11, 1994.

Benjamin W. Bull, Nikolas T. Nikas, Phoenix, AZ, for Katherine Sabelko and Nancy Barto.

Marvin A. Sondag, City of Phoenix Law Dept., Civ. Div., Roderick Gregory McDougall, Office of City Atty., Asst. City Atty., Phoenix, AZ, for City of Phoenix, Paul Johnson, Thelda Williams, Frances Emma Barwood, Skip Rimsza, Craig Tribken, John Nelson, Kathy Dubs, Salomon F. Leija and Calvin C. Goode.

Lawrence Jay Rosenfeld, Helen Rubenstein Holden, Sacks Tierney & Kasen, PA, Phoenix, AZ, Roger K. Evans, Legal Action for Reproductive Rights, Planned Parenthood Federation of America, New York City, for Planned Parenthood of Central and Northern Arizona, Inc.

## MEMORANDUM OF DECISION AND ORDER

McNAMEE, District Judge.

### *INTRODUCTION*

On November 17, 1993 Phoenix City Ordinance No. G3705 was enacted and made immediately effective. The Ordinance, codified as Phoenix City Code § 23–10.1, provides:

WHEREAS unimpeded access to health care services is critically and uniquely im-

portant to the public health, safety, and welfare; and

WHEREAS persons attempting to access health care facilities are subject to harassing or intimidating activity tending to impede their access to those facilities by demonstrators approaching within extremely close proximity; and

WHEREAS such activity near health care facilities creates a "captive audience" situation where persons seeking services cannot avoid the area outside the facilities, and their physical and emotional conditions may make them especially vulnerable to the adverse physiological and emotional effects of such harassing or intimidating activities directed at them from extremely close proximity; and

WHEREAS such activity in extremely close proximity tends to undermine a person's right to privacy and interfere with a person's right to seek legitimate health care treatment and counseling; and

WHEREAS this ordinance does not preclude all protesting, picketing, demonstrating, leafletting, or educational activities near a health care facility but is a necessary time, place, and manner restriction intended to reconcile and protect the First Amendment rights of demonstrators and the rights of persons using health care facilities to be free from direct confrontation, hindrance, harassment, intimidation, and harm; and

WHEREAS existing law does not adequately protect such access to health care facilities; NOW THEREFORE,

BE IT ORDAINED by the Council of the City of Phoenix as follows:

SECTION 1. Chapter 23, Article 1, Phoenix City Code is amended by adding section 23–10.1 to read:

Sec. 23–10.1 IMPEDING ACCESS TO HEALTH CARE FACILITIES

A. It is unlawful for any person, in the course of demonstration activity within the access area of a health care facility, to fail to withdraw upon a clearly communicated request to do so to a distance of at least eight (8) feet away from any person who has made the request.

B. For the purposes of this section:

1. "Access area" means any portion of a public street or other public place or any place open to the public within one hundred (100) feet of an exterior wall or entryway of a health care facility.

2. "Demonstration activity" includes but is not limited to protesting, picketing, distributing literature, attempting to impede access, or engaging in oral protest, education, or counseling activities.

3. "Health care facility" means any hospital, clinic, office, building or other place used to provide medical, psychological, nursing, or other health care services, including family planning counseling and pregnancy-related services.

4. For purposes of this section, distance shall be measured from that part of the closest demonstrator's body that is nearest to the closest part of the requesting person's body. The term "body" includes any natural or artificial extension of a person's body including an outstretched arm or hand-held sign.

SECTION 2. WHEREAS the immediate operation of the provisions of this ordinance is necessary for the preservation of the public peace, health, and safety, an EMERGENCY is hereby declared to exist, and this ordinance shall be in full force and effect from and after its passage by the Council as required by the City Charter and is hereby exempted from the referendum clause of said Charter.

On November 23, 1993, Plaintiffs Katherine Sabelko and Nancy Barto filed CIV 93–2229–PHX–SMM. The named Defendants are the City of Phoenix, the Mayor of Phoenix, and all members of the Phoenix City Council. The Complaint seeks declaratory and injunctive relief from Phoenix City Code § 23–10.1 [hereinafter, "the Ordinance"] which, according to Plaintiffs, "restricts the exercise of pristine First Amendment rights in traditional public fora."

In their Complaint, Plaintiffs challenge the Ordinance as: (1) Count One: a violation of the right to freedom of speech under the First Amendment to the U.S. Constitution; (2) Count Two: a violation of the right to freedom of the press under the First Amend-

ment to the U.S. Constitution; (3) Count Three: a violation of the right to peaceable assembly under the First Amendment to the U.S. Constitution; (4) a violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; (5) Count Five: a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; and (6) Counts Six through Nine: violations of applicable parallel sections of the Arizona State Constitution.

Plaintiffs applied for a Temporary Restraining Order ("TRO") pursuant to Federal Rule of Civil Procedure 65. The Court granted the TRO, thereby temporarily restraining and enjoining the Defendants and any and all persons acting in concert with them, including the Phoenix Police Department, from enforcing the Ordinance. Pursuant to the stipulation of the parties, the TRO has been continued pending a determination by the Court on Plaintiffs' application for a preliminary injunction.

On December 8, 1993, Planned Parenthood of Central and Northern Arizona, Inc. [hereinafter "Petitioner"] filed (1) a Motion for Leave to Intervene in the above captioned matter, and (2) an ex parte Motion for Order Expediting Hearing on its Motion to Intervene. That same day, the Court granted the ex parte Motion for Expedited Hearing and set oral argument on the Motion to Intervene for 1:00 p.m. on Monday, December 13, 1993. The Court denied the Motion to Intervene but granted Petitioner permission to file a brief, *amicus curiae.*

The Court has reviewed the briefs submitted by the parties and the amicus. Both an evidentiary hearing and oral argument on the application for preliminary injunction were held on Friday, December 17, 1993. After careful consideration of relevant precedent, the evidence submitted, and the arguments presented, the Court herein rules on Plaintiffs' application for a preliminary injunction.

## SCOPE OF FIRST AMENDMENT JUDICIAL REVIEW

"[T]he First Amendment reflects a 'profound national commitment' to the principle that debate on public issues should be uninhibited, robust, and wide-open ... and [the Supreme Court] ha[s] consistently commented on the central importance of protecting speech on public issues." *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (citations omitted).

Judicially defining the parameters of free speech is difficult. The United States Supreme Court and the lower federal courts have wrestled with this issue since the adoption of the First Amendment. The analysis is even more difficult when, as in this case, First Amendment rights clash with other competing constitutional rights. While the case law is replete with scholarly analyses of the issue concerning conflicting constitutional rights, the courts that attempt to synthesize and harmonize the conflicting viewpoints expressed in literally hundreds of pages of precedent are faced with a formidable task. More importantly, though, the citizens who must apply the holdings of these cases to the exercise of their rights in everyday life must be overwhelmed by the legal resolution of these conflicts that sometimes seem to provide conflicting practical guidance.

At this juncture, it should be noted that on January 21, 1994, the Supreme Court granted certiorari in *Madsen v. Women's Health Center, Inc.,* —— U.S. ——, 114 S.Ct. 907, 127 L.Ed.2d 98 (1994). By granting this review, the Supreme Court will hear arguments stemming from the Florida Supreme Court's decision in *Operation Rescue v. Women's Health Center, Inc.,* 626 So.2d 664 (Fla.1993), which upheld the provisions of an injunction that the Eleventh Circuit Court of Appeals declared unconstitutional in *Cheffer v. McGregor,* 6 F.3d 705 (11th Cir.1993).[1] While this Court anticipates the decision in *Madsen* will address some of the issues raised in this case, it is important to note

---

1. In *Cheffer,* an individual brought a judicial action seeking to preliminarily enjoin enforcement of a state court injunction that created a "buffer zone" which restricted anti-abortion speech in the vicinity of an abortion clinic. The district court refused to grant the preliminary injunction.

On appeal, the Eleventh Circuit vacated the district court's order denying the preliminary injunction and remanded the case for further consideration not inconsistent with the constitutional analysis contained in its opinion, indicating the injunction should be granted.

that the procedural development of the cases is quite different. This case involves an ordinance of general applicability which imposes criminal penalties for violations. In contrast, the Florida case involves the provisions of a court-ordered injunction with limited applicability to the parties in the case, the provisions of which are only civilly enforceable.[2] Thus, the Court issues this opinion rather staying the case pending the decision in *Madsen.*

## STANDARD OF REVIEW

■ The purpose of a preliminary injunction is to preserve the status quo among the parties pending the outcome of the action. *Regents of the University of California v. A.B.C., Inc.,* 747 F.2d 511, 515 (9th Cir.1984). Under the Ninth Circuit's traditional test for determining whether to issue a preliminary injunction, the moving party must demonstrate the following:

1. The moving party will suffer irreparable injury if the injunctive relief is not granted;

2. The moving party has a substantial likelihood of succeeding on the merits;

3. An injunction will not harm the non-moving party more than it helps the moving party; and

4. Granting injunctive relief is in the public interest.

*City of Tenakee Springs v. Block,* 778 F.2d 1402, 1407 (9th Cir.1985); *Martin v. Int'l Olympic Comm.,* 740 F.2d 670, 674–75 (9th Cir.1984).

■ In recent years, an alternative test has been articulated. Under the alternative test, the moving party must demonstrate either:

1. Probable success on the merits and the possibility of irreparable harm; or

2. The lawsuit raises serious questions and the balance of hardship tips sharply in the movant's favor.

*Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991); *City of Tenakee Springs,* 778 F.2d at 1407; *Martin,* 740 F.2d at 675; *Wilson v. Watt,* 703 F.2d 395, 399 (9th Cir.1983); *Beltran v. Meyers,* 677 F.2d 1317, 1320 (9th Cir.1982).

## DISCUSSION

### I. IRREPARABLE HARM

"It is undisputed that the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Thus, the irreparable harm part of the preliminary injunction test is satisfied and tips in favor of the Plaintiffs. *See also Memphis Comm. School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (holding monetary recovery cannot compensate for injury to intangible rights guaranteed by the Constitution).

### II. LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. First Amendment Rights Are Clearly Implicated

■ Plaintiffs declare that the "sidewalk counseling" in which they engage consists of "efforts to educate, counsel, persuade, or inform passer[s]by about abortion and abortion alternatives by means of verbal and written speech...." Sabelko Declaration at ¶ 7; Barto Declaration at ¶ 6. There is no question that such conduct implicates First Amendment rights. *See, e.g., City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (oral protest rests at the very heart of the right to free speech); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (distribution of literature via leafletting is a form speech which is an "expressive activity protected by the First Amendment").

Amicus Planned Parenthood argues that First Amendment rights are not the central issue in the case. Instead, Amicus asserts

---

2. Some of the difficulty the Court experienced in grappling with the issues presented by this case stems from the fact that several of the cases upon which the parties rely are, like *Cheffer,* based on the interpretation of court-ordered injunctions rather than constitutionally based challenges to provisions of criminal or quasi-criminal law. The distinction is not merely one of semantics, but rather, as discussed later in the Court's opinion, is one of consequence.

that whatever impact the Ordinance may have on First Amendment rights is secondary and incidental to the fact that the Ordinance permissibly regulates conduct. As such, the Ordinance should not be reviewed under the traditional time, place, and manner restriction on free speech test, but rather should be reviewed under the regulation of conduct test as set forth in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The Court disagrees with Amicus' characterization of this issue for several reasons.

First, the scope of the holding in *O'Brien* case as originally set forth in 1968 has been narrowed by subsequent cases. *See, e.g., Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir.1993); *Abney v. United States*, 616 A.2d 856 (D.C.1992). Moreover, the Supreme Court's decisions regarding expressive conduct as speech in *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1990) (holding flag burning to be expressive speech protected by the First Amendment), and *United States v. Eichman*, 496 U.S. 310, 319, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287 (1990) (holding same as *Texas v. Johnson*), further limit *O'Brien*'s applicability.

Second, in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Supreme Court has made clear that the *O'Brien* test "is little, if any, different from the standard applied to time, place, and/or manner restrictions." *Ward*, 491 U.S. at 798, 109 S.Ct. at 2757.

Finally, Defendants conceded in their Response in Opposition to the Application for Preliminary Injunction and again at oral argument that they cannot argue that the Ordinance regulates conduct since it restricts the ability to distribute leaflets which has repeatedly been held to be tantamount to speech. *See, e.g., United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). The very face of the Ordinance in question in this case claims its legitimacy as a "time, place, and manner restriction." Thus, the Ordinance must be reviewed under the time, place, and manner test.

**B. Access to the Public Forum is Clearly Implicated**

■ The degree of judicial scrutiny of the government regulation frequently turns on the nature of the place being regulated. The fora in which Plaintiffs exercise their First Amendment rights include public streets and public sidewalks. These streets and sidewalks are often within 100 feet of the entrances to medical facilities, the area regulated by the Ordinance in question in the present case. These areas constitute the "quintessential" public fora for free speech which "have been immemorially held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communication of thoughts between citizens, and discussion of public questions." *Id.* (quoting *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)); *see also Frisby v. Schultz*, 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting *Hague*).

All of the parties agree that the communications in which Plaintiffs wish to engage are protected by the First Amendment via the Fourteenth Amendment. *See* Plaintiffs' Brief at 10; Defendants' Brief at 3; *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (holding the Fourteenth Amendment Due Process Clause protects freedom of expression against state infringement). With all parties in agreement that the Ordinance seeks to regulate activity protected by the First Amendment in a public forum, the issue is whether the Ordinance does so within the limits prescribed by the Constitution.

**C. Permissible Restrictions on the First Amendment Generally**

[5] There is no doubt that the First Amendment right to free speech does not grant an unfettered right to all types of speech. *See, e.g., Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscene speech); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words). What is clear, though, is that "above all else the First Amendment means that government has no power to restrict expression because of its

message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

■ The exercise of First Amendment rights in the public forum may be limited by regulations that are valid time, place, and manner restrictions. *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988). The Defendants contend that the Ordinance in this case meets the "time, place, and manner restriction" test. For a time, place, and manner restriction to withstand constitutional scrutiny, the restrictions must:

1. be content neutral;
2. be narrowly tailored to serve a significant governmental interest; and
3. leave open ample alternative channels of communication.

*Frisby,* 487 U.S. at 481, 108 S.Ct. at 2500. The appropriate standard under which this three-prong test is applied to review the propriety of a time, place, and manner restriction is strict scrutiny. *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990). Applying this test, Phoenix City Ordinance No. G3705 does not meet constitutional standards.

### D. Content Neutrality

■ In the context of the traditional public forum, the distinction between a content-based regulation and a content neutral time, place, and manner regulation is a crucial one. Any law which regulates the time, place, and manner of protected speech must not be based on the content of the message. *E.g. Forsyth County v. Nationalist Movement,* —— U.S. ——, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

■ Plaintiffs claim the Ordinance in question is not content neutral because is applies to the category of speech termed "demonstration activity," defined in subsection (1)(B)(2) of the Ordinance as including protesting, picketing, distributing literature, or engaging in oral protest, education, or counseling activities. While the Ordinance seemingly applies to all non-oral protesting such as picketing or distributing literature, it applies only to those spoken exercises of the right to freedom of speech which constitutes "oral protest, education, or counseling." The Defendants argue the Ordinance makes no distinctions regarding the content of communication and, ipso facto, is thus content neutral.

In *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Supreme Court stated that "the principle inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 789, 109 S.Ct. at 2754.

The evidence submitted by the parties regarding the legislative history of the ordinance demonstrates, without qualification, that the Ordinance was enacted in direct response to "anti-abortion" speech outside medical clinics. *See* Transcript of Discussion on Item 4, Phoenix City Council Policy Session on November 16, 1993; Transcript of Discussion on Item 28, Phoenix City Council Meeting on November 17, 1993.

In *Portland Feminist Women's Health Center v. Advocates for Life, Inc.,* 859 F.2d 681 (9th Cir.1988) [hereinafter *"Portland"*], an injunction against "demonstrating or distributing literature . . .; shouting, screaming, chanting, or yelling" by anti-abortion organizations and those acting in concert was deemed to be both content-neutral and a reasonable time, place, and manner restriction on speech. *Id.* at 686. The court found the preliminary injunction was not a content-based restriction of expression because it did not refer to specific viewpoints that advocates raised at demonstrations. Rather, the injunction focused on the location and manner of expression, protecting the clinic from loudness and physical intimidation, not from content of speech.[3]

■ Unlike the injunction in *Portland,* the Ordinance in question in this case specifi-

---

**3.** The Court recognizes that the Eleventh Circuit's decision in *Cheffer* differs from this reasoning. *Cheffer,* 6 F.3d at 710 n. 10.

cally targets "protest" communications. The very fact that protest communications are targeted by the Ordinance indicates that the law will turn on either the content of the speech or the viewpoint expressed. If the speaker "protests," the speech is prohibited by the Ordinance. On the other hand, if the speaker "supports," the speech may or may not be violative of the Ordinance. Thus, the Ordinance imposes criminal liability depending on the content and viewpoint of speech. Viewpoint discrimination is unconstitutional. *R.A.V. v. City of St. Paul, Minn.,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).[4]

■ Defendants assert this is an improper characterization of the Ordinance. They claim the Ordinance does not "target" any type of speech, but rather would provide for criminal liability of any speaker who failed to withdraw to the eight-foot minimum distance, even if the speaker is demonstrating "support." The Court finds this argument unpersuasive since the invocation of the "bubble zone" will likely depend upon whether the listener agrees with or disagrees with the content of the speaker's communication. "Listeners' reaction to speech is not a content neutral basis for regulation." *Forsyth,* —— U.S. at ——, 112 S.Ct. at 2403.

However, even if, arguendo, the Ordinance were deemed to be content neutral, the Ordinance still fails as a time, place, and manner restriction because it is not narrowly tailored to achieve the governmental interest specified.

### E. *Narrowly Tailored*

■ The First Amendment requires that a regulation on free speech be narrow and precise. *City of Houston v. Hill,* 482 U.S. 451, 464–67, 107 S.Ct. 2502, 2511–12, 96

L.Ed.2d 398 (1987). A law is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby,* 487 U.S. at 485, 108 S.Ct. at 2503 (citations omitted).

The City of Phoenix claims it has a significant governmental interest in protecting "the right of persons using health care facilities to be free from direct confrontation, hindrance, harassment, intimidation, and harm." Plaintiffs asserted at oral argument that the government is seeking to protect people from "the impact of words." The Court need not decide whether the City's articulated interest is a valid, significant governmental interest within the meaning of a reasonable time, place, and manner restriction. For the purposes of this analysis, the Court presumes, for the sake of argument, that there is a valid, legitimate governmental interest at stake. Yet, even with this presumption, the Court finds the Ordinance is not narrowly tailored to achieve this interest.

The Defendants claim "this Ordinance is very narrowly tailored to serve the identified government[al] interest. The harms to persons approaching health care facilities flow from the close proximity efforts of others to force their message on unwilling listeners.[5] The Ordinance has no application away from health care facilities." Defendants' Brief at 7 (footnote added). Once again, the Court disagrees.

### 1. Overbreadth

■ The doctrine of overbreadth concerns the precision of a law, and an analysis of whether the law in question sweeps too broadly by indiscriminately reaching both protected and unprotected expression. *See,*

---

4. The Court notes that (1) the decision in *Portland* predated the Supreme Court's pronouncement regarding content neutrality in *R.A.V. v. City of St. Paul;* (2) *Portland* reviewed the terms of an injunction under the standards annunciated in Rule 65(d), a different standard than is applicable in this case, as the Court is reviewing a legislative ordinance; and (3) the *Portland* court specifically said that its analysis would differ if the injunction applied to all persons, rather than just the parties to that lawsuit, thereby precluding any "chilling effect" on the exercise of First Amendment rights in the public at large.

5. The fact that Defendants argue the Ordinance seeks to protect the "unwilling listener" demonstrates that the Ordinance is not content neutral since "listeners' reaction to speech is not a content neutral basis for regulation." *Forsyth,* —— U.S. at——, 112 S.Ct. at 2403. It is the very fact that some are offended by the content of the speech that affords it First Amendment protection. *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 881, 99 L.Ed.2d 41 (1988).

e.g., *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

■ The Ordinance in this case restricts such activities as the display of signs, the distribution of literature, and even the mere voicing of statements which are of an educational, counseling, or protesting nature. Yet, the Supreme Court has affirmed the constitutionally protected status of such activities. *See Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (public demonstration, including display of signs and placards, lies "at the core" of the "First Amendment"); *City of Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (oral protest rests at the very heart of the right to free speech); *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (distribution of literature via leafletting is a form speech which is an "expressive activity protected by the First Amendment"); *Carey v. Brown*, 447 U.S. 455, 466–67, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980) (picketing is an exercise of "basic constitutional rights in their most pristine form").

The annunciated intent of this Ordinance is to prevent impeded access to health care facilities. The overbreadth of the Ordinance is most evident insofar as it restricts passive leafletting and handbilling even though the Supreme Court has warned against time, place, and manner restrictions on such conduct in the public forum. *See, e.g., Ward*, 491 U.S. at 799 n. 7, 109 S.Ct. at 2758 n. 7 ("a ban on handbilling, of course, would suppress a great quantity of speech that does not cause evils that its seeks to eliminate"); *see also Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).

Defendants argue the Ordinance is not overbroad because its allows an individual to ban certain activities only within eight feet of his or her person.[6] Citing *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), Defendants assert that Plaintiffs only have a right to distribute literature to a person willing to receive it. *Frisby*, howev-er, upheld a municipal ordinance which prohibited picketing around a private residence. *Id.* at 483–85, 108 S.Ct. at 2501–02. The Court made it clear that the First Amendment does not permit a speaker to force an unwilling listener to be subject to the exercise of free speech in his home. The Ordinance in this case, unlike the one in *Frisby*, does not regulate speech in and around private homes but attempts to do so on public streets and sidewalks.

Defendants correctly state there is no First Amendment right to block a public street or sidewalk or to block ingress and egress to a public or private building in an effort to exercise the rights of free speech and expression. *See, e.g., Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). From this proposition, and the holding in *Frisby*, Defendants mistakenly extrapolate the legitimacy of the "free zone" or "bubble zone" created by the Ordinance. Specifically, Defendants assert:

> The Phoenix City Council found that the eight foot restriction was necessary to counteract specific abuses that impede ingress to medical facilities. Plaintiffs would have this Court second-guess whether the Phoenix City Council could have achieved its goals with a narrower free zone. Faced with similar challenges, other courts have declined to entertain quibbling over a few feet.

Defendants' Response at 11.

In essence, the Ordinance's distance requirement effectively prevents handbilling and leafletting based upon the subjective reaction of the person to whom the literature is offered. It is physically impossible to hand a leaflet or handbill to someone from eight feet away. Moreover, those persons who are unwilling to accept it are free to refuse. If the people distributing the literature attempt to force a handbill or leaflet on an unwilling recipient, other provisions of the Arizona Criminal Code protect those interests, including the provisions governing assault and battery, criminal trespass, stalking, disorder-

6. The fact that an individual has the power to effectuate this ban, once again, demonstrates that the Ordinance is not content neutral because its application turns on the subjective reaction of the recipient of the speech at issue. *Forsyth*, —— U.S. at ——, 112 S.Ct. at 2403; *Boos*, 485 U.S. at 321, 108 S.Ct. at 1164 (O'Connor, J., concurring).

ly conduct, disturbing the peace, rioting, criminal nuisance, and, in the worst case scenario, even murder.

The Court also notes that the present Ordinance is much broader than the injunction upheld in *Portland Feminist Women's Health Center v. Advocates for Life*, 859 F.2d 681 (9th Cir.1988). First, *Portland* dealt with a civil preliminary injunction that was of limited duration. The Phoenix Ordinance is both criminal and permanent. Second, the injunction in that case was binding only on the parties to the action and no one else. In contrast, the Ordinance in this case restricts speech of all persons. Finally, the Ninth Circuit narrowed the scope of the injunction to include only "shouting, screaming, ... [and] yelling that substantially interfere[d] with the provision of medical services within the [medical facilities at issue], including counseling." *Id.* at 686. Thus, the volume of communications was reasonably restricted in time, place, and manner, but the content of these communications was not restricted. The alternative of quiet oral communication was not enjoined. The scope of the Ordinance in the present case is much broader as it restricts all types of First Amendment activities that may fall under the umbrella of "demonstration activities" whether they be peaceful or boisterous, quiet or loud, or whether they interfere with the operation of the medical facility or not. The Ordinance is therefore unconstitutionally overbroad.

2. Vesting of Power in Private Citizens

 One of the most constitutionally troublesome aspects of this Ordinance is the fact that what is subject to criminal punishment under the terms of the Ordinance is not objectively defined. The Ordinance empowers private citizens with unrestrained discretion to restrict or permit First Amendment expression. Where the criminalization of protected First Amendment expression turns on unfettered discretion, there is a substantial risk that the discretion can be used in the suppression of ideas and is therefore unconstitutional. *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

Defendants and Amicus argue the unfettered discretion issue was resolved by the Supreme Court in *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). *Rowan* upheld a statute under which the recipient of a mailed advertisement could require the mailer to remove the recipient's name from its mailing lists if the advertisement offered to sell "matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." *Id.* at 736–37, 90 S.Ct. at 1490. Thus, *Rowan* involved a reasonable regulation designed to protect the privacy of homeowners. As discussed below, the Supreme Court has upheld a number of restrictions on First Amendment rights when the exercise of these rights forces someone in the privacy of their own home to be an unwilling recipient of communications. *See also Frisby*, 487 U.S. at 487, 108 S.Ct. at 2503; *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). Since this Ordinance in the present case regulates in the public forum away from the home the Court is not persuaded that the rationale of *Rowan* is applicable to this case.

In *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), a Georgia breach of the peace statute was held unconstitutionally overbroad. The statute made it "a breach of the peace merely to speak words offensive to some who hear them, and so [swept] too broadly." *Id.* at 527, 92 S.Ct. at 1108. Unlike *Gooding*, the Ordinance in this case does not, on its face, claim to impose criminal liability based on whether the listener finds the expression "offensive." However, the Ordinance does so *sub silentio.* Thus, like *Gooding*, the application of the Ordinance would turn on the content of the message being expressed. The fact that some listeners might be disturbed or feel harassed by the content of the speech does not diminish its constitutionally protected status. If it is the speaker's opinion that gives rise to the offense, that consequence is a reason for according it constitutional protection. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* — U.S. —, —, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991). In other words, it is the very fact that members of society might find the idea expressed to be offensive or disagreeable that is the basis for the First Amendment

protection of the message in the first place. *See Texas v. Johnson,* 491 U.S. at 414, 109 S.Ct. at 2544; *United States v. Eichman,* 496 U.S. at 319, 110 S.Ct. at 2410.

Because a valid time, place, and manner restriction on First Amendment freedoms must be narrowly tailored, the Ordinance which fails to put objective criteria for its enforcement in place cannot stand. *See Forsyth County,* —— U.S. at ——, 112 S.Ct. at 2403.

### 3. Vagueness

 The vagueness doctrine is based on due process principles that require fair notice and warning. It incorporates a requirement that a law be sufficiently specific to avoid arbitrary and discriminatory enforcement by police and courts. *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). An unconstitutionally vague law delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

 The most stringent of scrutiny is applied to the examination of a statute for vagueness when the statute induces a chill on free speech. *See, e.g., Hynes v. Mayor & Council of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) (stating the general test for vagueness applies with particular force in review of laws dealing with speech); *Smith v. California,* 361 U.S. 147, 149, 80 S.Ct. 215, 216, 4 L.Ed.2d 205 (1959). The requirement of specificity in legislation that impacts on First Amendment rights seeks to preclude a chill on free speech that results from vague laws: "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Grayned,* 408 U.S. at 109, 92 S.Ct. at 2299 (citations omitted). Applying this test to the Ordinance in question, it is clear that it cannot withstand constitutional scrutiny for vagueness.

The Ordinance by its own terms is intended to protect persons in a "captive audience"[7] who find certain speech "harassing or intimidating." Where the lawfulness of speech turns on the reactions of others, the restriction is unconstitutional. *Coates v. Cincinnati,* 402 U.S. 611, 611–14, 91 S.Ct. 1686, 1686–88, 29 L.Ed.2d 214 (1971). In *Coates,* the Court struck down an ordinance that made it illegal for "three or more persons to assemble ... on any of the sidewalks ... and there conduct themselves in a manner annoying to persons passing by...." *Id.* at 611, 91 S.Ct. at 1686–1687. The Court held that a city cannot enact an ordinance whose violation depends on the subjective reactions of others. *Id.* at 614, 91 S.Ct. at 1688.

 Defendants argue that unlike the situation in *Coates,* the present Ordinance sets a specific standard for conduct: persons engaged in demonstration activity must withdraw at least eight feet from the person making the request to do so. Defendants fail to recognize, however, that there are two distinct areas of uncertainty that are at the very crux of the vagueness problem presented by this Ordinance: (1) what is "demonstration activity"; and (2) what constitutes a "clearly communicated request" to withdraw.

The Ordinance declares that "demonstration activity" includes, but is not limited to, "protesting, picketing, distributing literature, attempting to impede access, or engaging in oral protest, education, or counseling activities." A speaker cannot, from this definition, know with constitutional certainty when speech will be deemed criminal under the terms of the Ordinance. For example, what does the term "oral protest" include? Songs? Speeches? Prayer? Because the resolution of such questions will turn on the subjective and ad hoc determinations of police, judges, and juries, the Ordinance is void for vagueness. *Grayned,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99.

---

7. The significance of a "captive audience" is discussed below at pages 823–25. Even if the captive audience doctrine were applicable in this case, that would not save the Ordinance from being unconstitutionally vague.

Moreover, what constitutes a clearly communicated request to withdraw? "I do not wish to hear from you, please withdraw to the minimum eight feet distance to allow me to pass unimpeded to the clinic" would be a clearly articulated request under the Ordinance, the failure with which to comply would subject the speaker to criminal liability. More realistically, however, the communication might be "get lost" or "buzz off." What about "shut up!"? A grunt? A push? A roll of the eyes with a mumbled swear word? The fact that the reactions and expressions of a private individual can cause the speaker to be subject to criminal liability and the fact that the speaker must interpret whether there has been a clearly communicated request to withdraw both demonstrate the lack of objective criteria that ordinary, reasonable people would have to determine whether they are subject to the provisions of the Ordinance. *See Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

Defendants and Amicus have pointed the Court to some authority that suggests whether there has been a clearly articulated request to withdraw is a question of fact that would provide a defense to someone charged under the Ordinance. This begs the point. The very fact that someone will not know if they are *subject to criminal liability* under the Ordinance until *after* they are arrested and tried demonstrates why the Ordinance is vague. Judges and juries could easily differ on whether "shut up" or a similar comment clearly communicated a request to withdraw. Such subjective and ad hoc determinations show the vagueness of the Ordinance. *Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99.

In short, the Ordinance uses terms which are so indefinite that persons of common intelligence must guess at their meaning and differ as to their application. The Ordinance is therefore unconstitutionally vague. *Connally*, 269 U.S. at 391, 46 S.Ct. at 127.

4. Alternative Channels of Communication

█ The Supreme Court has held that a restriction on free speech that claims to be a valid time, place, and manner restriction must leave open alternative channels of communication. *Forsyth County*, —— U.S. at ——, 112 S.Ct. at 2401; *Frisby*, 487 U.S. at 481, 108 S.Ct. at 2500. Under this test, a regulation is invalid if the restricted forum constitutes a "uniquely valuable or important mode of communication." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812, 104 S.Ct. 2118, 2132, 80 L.Ed.2d 772 (1984).

█ In *Taxpayers for Vincent*, the Court upheld a ban on the posting of signs on public property because the ban did not affect any individual's freedom to exercise the right to speak in the same place where the posting of signs was prohibited. *Taxpayers for Vincent*, 466 U.S. at 812, 104 S.Ct. at 2132. Unlike in that case, the Phoenix Ordinance reaches *all* types of communication that may fall within the vague and overbroad definition of "demonstration activities."

As stated above, the Supreme Court has recognized hand-to-hand leafletting as a uniquely valuable mode of communication protected under the First Amendment. *See, e.g., Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). If a leafletter is required to move more than eight feet away from the intended recipient, there is no equally valuable or effective means of communication tantamount to leafletting that are left open.

The Ordinance sought to alleviate some of the "harassing or intimidating" types of confrontations that have unfortunately beleaguered the persons whom this Ordinance seeks to protect. Ironically, by preventing leafletting and handbilling, the Ordinance leaves no mode of communication open other than withdrawing to a certain distance and orally communicating with a raised voice. The Ordinance thereby forces those who wish to exercise their First Amendment rights to resort to shouting from a distance, which inevitably leads to a more hostile and confrontory environment than does peaceful handbilling and leafletting. Moreover, by forcing "demonstration activities" to occur at distances that require amplified volume for the messages to be received by the target audience, the Ordinance may be subjecting

those seeking to engage in free speech activities to be subject to other criminal sanctions, such as public nuisance, disorderly conduct, and disturbing the peace. Clearly, the Ordinance therefore does not leave open ample alternative channels of communication.

## III. THE BALANCING OF EQUITIES

As illustrated by the analysis above, the balancing of hardships clearly tips in favor of the Plaintiffs. Balancing the equities in this case is most difficult, though, since First Amendment rights are at issue on one hand and, in the most basic of terms, the right to be left alone is on the other. *See, e.g. Rowan v. United States Post Office Dep't,* 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970) ("no one has the right to press even good ideas on an unwilling recipient"). In describing this part of the preliminary injunction analysis, the Court in *Cheffer* stated:

It is difficult indeed to weigh the relative value of different constitutional rights. Our sister circuit described a similar abortion protest case as a "clash ... between constitutional rights defined by the Supreme Court: an old one tracing its roots to the speech clause of the First Amendment and before, and a new one stemming from *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)]."

\* \* \* \* \* \*

The clash here is between an actual prohibition of speech and a potential hinderance to the free exercise of abortion rights. Should the district court issue an injunction barring the state court from enforcing its injunction as a criminal statute, it would promote only speech and expressive conduct, not assault, trespass, or destruction of property.

*Cheffer v. McGregor,* 6 F.3d 705, 711 (11th Cir.1993).

▮ Part of this analysis involves the application of the so-called "captive audience" doctrine. When a case presents, as this one does, a conflict between the right to speak and the right to be left alone, the right of the listener is entitled to considerable weight when the listener is a member of a captive audience. *See, e.g., Frisby,* 487 U.S. at 487,

108 S.Ct. at 2504; *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

▮ In general, the captive audience doctrine does not apply when the unwilling audience is located on a public street or sidewalk because they can avoid the unwanted message simply by walking away or averting their eyes. *Erznoznik v. Jacksonville,* 422 U.S. 205, 211, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975); *Cohen v. California,* 403 U.S. at 21, 91 S.Ct. at 1786. It is an inevitable byproduct of life in modern day society, especially in an urban setting, that "we are often captives outside the sanctuary of the home and [thus] subject to objectionable speech." *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970). Due to this fact, the Supreme Court has consistently rejected application of the captive audience doctrine in cases involving free speech that occurs outside the home or its environs.

For example, in *Erznoznik v. Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Court invalidated a city ordinance prohibiting drive-in movie theaters from showing films containing nudity where the screen was visible from a public street. The Court specifically found (1) the ordinance was not content neutral, and (2) the public was not a captive audience. Similarly in *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), the fact that persons on a public street could not shield themselves from the use of a particularly offensive swear word in a loud voice on a public street did not give rise to a situation where the captive audience doctrine could apply. These cases illustrate that the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker; the offended listener is required to turn away. *FCC v. Pacifica Foundation,* 438 U.S. 726, 749 n. 27, 98 S.Ct. 3026, 3040 n. 27, 57 L.Ed.2d 1073 (1978).

The captive audience doctrine is most often applied in cases where the unwilling audience is subjected to the speaker's expressive activity near the home. For example, in *Frisby,* 487 U.S. at 487, 108 S.Ct. at 2504, the Court upheld a local ordinance banning "focused" picketing of a physician's private residence

on the ground that the speech at issue made the residents of the doctor's house "captives" in their own home. Similarly, in *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), the Court upheld a ban on amplified sound trucks because they were so intrusive that they made it impossible for people to escape their message.

■■■■ Outside of the setting of the home, especially in the public forum, the doctrine has limited application. It is clear, though, that the captive audience doctrine can be used outside the residential setting "when the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik*, 422 U.S. at 209, 95 S.Ct. at 2272–2273. When a situation rises to the level of making it impractical for the unwilling viewer or auditor to avoid exposure is a question of degree. The most clear cut example of a captive audience are inmates in a prison. Slightly less captive are those in the armed forces or children in public schools. While the public on a street falls far short of these highly captive audiences, there are situations when the Supreme Court has applied the doctrine in the public forum.

The most practical application of the captive audience doctrine in the public forum occurs when the unwilling audience is physically constrained by their environment. For example, in *Lehman v. Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), a plurality opinion by the Supreme Court found the doctrine to apply to rapid transit passengers on municipally-owned buses.

■■■ The Court finds that the captive audience rationale does not apply under the facts and circumstances of this case. The types of restrictions upheld in *Frisby* and *Kovacs* are far less restrictive than those imposed by the Ordinance in this case since those cases left open other alternative channels for communication. Unlike in *Lehman*, the forum being regulated by the Phoenix Ordinance includes public streets and sidewalks, not the enclosure of a bus, streetcar, or subway train.

Given the overbreadth of the Ordinance, it cannot be said that every person seeking access to every medical facility in the City of Phoenix is a captive to whatever message a person may be seeking to deliver in the public fora surrounding these facilities. For example, people are not forced to take and read literature offered to them outside a medical facility. They have the choice not to accept a leaflet or handbill. They also have the choice to take what is offered and simply discard it without ever reading it by "simply averting their eyes." *Erznoznik*, 422 U.S. at 211, 95 S.Ct. at 2273. The ability of an individual to effectuate a ban on handbilling under the provisions of the Ordinance demonstrates that the Ordinance simply goes too far in seeking to protect the right to be left alone.

■■■ Additionally, because the Ordinance is not narrowly tailored to advance the governmental interest of providing unimpeded access to medical facilities, the captive audience doctrine cannot be used to salvage the Ordinance. In *City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547 (7th Cir.1986), *aff'd without opinion*, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987), the court declared an ordinance unconstitutional which regulated door-to-door solicitation of private residences. The court found that the ordinance was not narrowly tailored to meet even the captive audience problem of the unwilling audience in the home. The Supreme Court summarily affirmed the decision.

Given the multiplicity of constitutional problems with this Ordinance and the extent of these constitutional infirmities, the First and Fourteenth Amendment rights of those who may be the subject of criminal prosecution under the Ordinance must outweigh the rights of those who seek to be left alone, even if a captive audience situation were to apply.

Enjoining the enforcement of the Ordinance promotes only speech and expressive conduct protected by the First Amendment. By issuing the injunction today, the Court does not condone "assault, trespass, or destruction of property," or any other forms of violence. *Cheffer*, 6 F.3d at 711. The Con-

stitution provides for peaceable assembly, not riotous behavior or mayhem. The City has at its disposal many laws to deal with those individuals who cannot peaceably assemble to exercise their freedom of expression to which the Constitution is no bar. The City may also choose to revise the Ordinance in question within the boundaries prescribed by the Constitution. *See National Organization for Women v. Operation Rescue,* 914 F.2d 582 (4th Cir.1990) (upholding injunction prohibiting pro-life organization and its members from trespassing on, blockading, impeding, or obstructing access to or egress from medical clinics at which abortions were performed), *rev'd in part & vacated in part, sub nom. Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (holding the Klu Klux Klan Act, 42 U.S.C. § 1985, could not be used to bring suit for conspiracy to deprive constitutional rights against anti-abortion protestors).[8]

## IV. THE PUBLIC INTEREST

■ Freedom of expression is at the very core of our constitutional liberties. The First Amendment continues to reflect a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open...." *Boos,* 485 U.S. at 318, 108 S.Ct. at 2725. Such robust debate is always accompanied by differences of opinion. Often these differences are profound and spark intensity of feeling and emotion. Indeed, "vehement, caustic, and sometimes unpleasantly sharp" speech is protected by the Constitution. *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). There are, no doubt, times when all of us wish that we did not have to put up with another person's exercise of these protected rights. Such, however, is the price we pay for living in a democracy. It serves the public interest to issue the injunction since doing so thereby fosters our democratic ideals and freedoms.

## CONCLUSION

The City of Phoenix passed the Ordinance in an attempt to provide unimpeded access to health care services for its citizens. While the Court understands the City's motives in establishing a neutral zone of passage around Phoenix medical facilities, the Court cannot overlook the fact that the mechanism the City uses to accomplish this end is an ordinance which fails to meet constitutional standards under the First Amendment.

For the reasons set forth above, the Court finds:

1. The Plaintiffs will suffer irreparable injury if the injunctive relief is not granted.

2. The Plaintiffs have demonstrated a substantial likelihood of succeeding on the merits because the Ordinance is not a valid time, place, and manner regulation of free speech due to the fact that:

 (a) the Ordinance is not a content neutral regulation of free speech;

 (b) the Ordinance is not narrowly tailored to achieve the stated governmental interest;

 (c) the Ordinance is unconstitutionally vague; and

 (d) the Ordinance fails to leave open alternative methods of communication in the public forum in which the law regulates.

3. The issuance of the injunction will not harm the City of Phoenix more than it helps the Plaintiffs.

4. Granting injunctive relief is in the public interest, as it fosters the core constitutional value of freedom of expression.

## ORDER

**IT IS ORDERED** that Plaintiffs' Application for a Preliminary Injunction is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that Phoenix City Ordinance No. G3705, codified as

---

**8.** The Supreme Court recently held in *National Organization for Women, Inc. v. Scheidler,* —— U.S. ——, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), that RICO statutes could be used to prosecute demonstrators who protest outside medical facil-

ities which provide abortion services. While worthy of mention, the Court does not believe that the decision in that case impacts the Court's analysis in the present case.

Phoenix City Code § 23–10.1, is hereby **DECLARED UNCONSTITUTIONAL** as violative of the First and Fourteenth Amendments of the United States Constitution.

**IT IS FURTHER ORDERED** that the Defendants, and any and all persons acting in concert with them, including, but not limited to their agents, servants, employees, attorneys, and the Phoenix Police Department, are hereby **RESTRAINED AND ENJOINED** from enforcing Phoenix City Ordinance No. G3705, codified as Phoenix City Code § 23–10.1, due to the unconstitutionality of the Ordinance as described herein.